# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 27, 2012 Session

## STATE OF TENNESSEE v. GREGORY TODD WHITAKER and DAVID PAUL COFFEY

### Appeal from the Criminal Court for Greene County
### Nos. 11CR184, 11CR185     John F. Dugger, Jr., Judge

---

### No. E2012-00253-CCA-R3-CD - Filed June 28, 2013

---

The Defendants, Gregory Todd Whitaker and David Paul Coffey, were both indicted for manufacturing twenty or more, but less than 100, marijuana plants, a Class C felony; and possession of drug paraphernalia, a Class A misdemeanor. See Tenn. Code Ann. §§ 39-17-417(g)(3), -425(a)(1). The Defendants both filed motions to suppress the evidence recovered during a search of Defendant Whitaker's trailer home. The trial court granted the Defendants' motions and dismissed the indictments. In this appeal as of right, the State contends that the trial court erred by granting the Defendants' suppression motions. Following our review, we reverse the judgments of the trial court and remand the cases for further proceedings consistent with this opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Reversed; Cases Remanded

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; C. Berkeley Bell, Jr., District Attorney General; Richie Dale Collins and Cecil Clayton Mills, Jr., Assistant District Attorneys General, for the appellant, State of Tennessee.

William Louis Ricker, Greenville, Tennessee, for the appellee, Gregory Todd Whitaker.

J. Bradley Mercer, Greenville, Tennessee, for the appellee, David Paul Coffey.

### OPINION

### FACTUAL BACKGROUND

Agent Tim Davis of the Third Judicial District Drug Task Force (DTF) testified that during the afternoon of May 2, 2011, he received a phone call from a person who wanted to remain anonymous. The caller informed Agent Davis "that there was an indoor marijuana grow operation going on" at Defendant Whitaker's trailer home. The caller also informed Agent Davis "that they were supposed to be harvesting that evening." Agent Davis testified that he drove by the address and verified that there "was a single-wide mobile home" at the end of a "long driveway" just as the caller had described.

Agent Davis then called the local utility company "to see about . . . the power consumption for that residence." Agent Davis testified that he did this because "indoor marijuana grow operations draw a lot of electricity." According to Agent Davis, Defendant Whitaker's previous electric bill "was well over $300 for a single-wide mobile home." Agent Davis testified that he felt this was "an excessive amount" because he lived "in a double-wide mobile home in [] basically the same general geographic area" and his electric bill was only "seventy-some dollars" for the same time period. Agent Davis testified that at that point in time, he did not believe that he had probable cause to justify a search warrant.

Agent Davis and the other DTF agents decided to conduct a "knock and talk" on Defendant Whitaker's residence. At approximately 10:00 p.m. five "marked" police cruisers, two from the Greene County Sheriff's Department and three from the DTF, drove to Defendant Whitaker's residence. Agent Davis testified that Defendant Whitaker's trailer home was "a couple hundred yards away" from the road. A gravel driveway ran from the road to the home. The driveway ended approximately thirty feet from the trailer home, and this was where the agents parked their cruisers. There was no walkway to the home, and the grass between the driveway and the home was three feet high. However, there were cars parked "all the way up to the [] porch."

Agent Davis testified that when he stepped out of his cruiser, he could smell "a distinct odor" of "green" or "fresh" marijuana. Agent Davis and two other agents walked to a porch near where the cars were parked and which "appear[ed] to be [the] main entrance." Two other agents walked around to the home's other entrance, which appeared to be "non-accessible." Agent Davis recalled that there were lights on in the house as he approached the door. Agent Davis knocked on a "sliding glass door," and Defendant Whitaker pulled back the curtains. Agent Davis "identified [himself], showed [Defendant Whitaker his] badge, . . . explained to him that [he] needed to speak to him and asked him if he would open the door."

Defendant Whitaker then "cracked" the door about "eighteen inches," and Agent Davis was overwhelmed by the "aroma of marijuana com[ing] out of the house." Agent Davis explained to Defendant Whitaker that he had received a tip that there were "some

narcotics in the residence" and asked Defendant Whitaker for his consent to search the home. Defendant Whitaker told Agent Davis that he would be glad to let Agent Davis search the house when he "showed up with a search warrant." At that point, Agent Davis reached into the residence, grabbed Defendant Whitaker by "his wrists," pulled him out of the residence, patted him down, and handcuffed him.

Agent Davis asked Defendant Whitaker if there was anyone else in the house, and Defendant Whitaker stated "that his buddy was in the house." Defendant Whitaker's mother was also standing in the doorway as this occurred. Agent Davis instructed two of the other agents to "detain the house . . . which meant that they were going to have to secure the residence." Agent Davis explained that he wanted the agents to "[s]weep the house for individuals, make sure there [was] no one in there that could destroy evidence, and . . . bring them out to where the house [was] secure and nothing [could] be destroyed or lost." Agent Davis further explained that he expected the agents to search every room and closet in the home to "make sure there[ was] no one else in there that could destroy evidence or come out and injure someone." Agent Davis admitted that when he ordered the agents to enter the home, "[t]here was no immediate threat to anyone at that time," and there was nothing to suggest that the evidence was in danger of being destroyed by the occupants of the house.

DTF Agent Thomas McCallie testified that he and DTF Agent Adam Arrington went into Defendant Whitaker's house to search for Defendant Whitaker's "buddy." Once inside the home, Agents McCallie and Arrington "came to a room that was partitioned off with plastic." They pulled the plastic back and saw Defendant Coffey "sitting in the middle of . . . the grow room" filled with marijuana plants. Defendant Coffey ignored the agents and their requests that he leave the room until Agent McCallie "drew [his] weapon and again ordered . . . [him] to come out." The agents seized Defendant Coffey and continued to search the house. Agent McCallie testified that he and Agent Arrington "didn't open anything" and that they left the house once they completed their "sweep."

Agent Davis testified that he left immediately to get a warrant after ordering the agents to search the house. Agent Davis further testified that he "used only the information [he] had at [that] time" in his warrant affidavit and that he "had no knowledge of what was in the house." Agent Davis's affidavit mentions the anonymous tip, the electrical usage at Defendant Whitaker's home, and that he smelled "fresh" marijuana upon exiting his cruiser and that the odor was "overwhelming" when Defendant Whitaker opened the sliding glass door. The affidavit makes no mention of Agents McCallie and Arrington entering the house or what they found in the house. Agent Davis returned several hours later with a search warrant. The agents recovered "approximately 100 marijuana plants" from Defendant Whitaker's home, as well as the equipment necessary to run "a very extensive hydroponic grow operation."

Based upon the foregoing evidence, the trial court granted the Defendants' motions to suppress the evidence recovered from Defendant Whitaker's trailer. The trial court concluded that the agents exceeded the scope of the knock and talk by going "to areas of the curtilage that they weren't supposed to." The trial court further concluded that exigent circumstances did not exist to justify Agents McCallie and Arrington entering the house to search for Defendant Coffey and that the agents "jumped the gun a little bit on this case." The trial court also concluded that the independent source doctrine did not prevent the exclusion of the evidence because there was no evidence that "anything [] was newly found, that wasn't already found."

## ANALYSIS

On appeal, the State contends that the trial court erred by granting the Defendants' suppression motions and dismissing the indictments. The State argues that the agents conducted a valid knock and talk and that the agents needed to secure the scene in order to protect themselves and ensure that the evidence would not be destroyed. The State further argues that even if the agents were not justified in their actions, the independent source doctrine applies because "the only information in the affidavit was obtained prior to the initial entry" of Defendant Whitaker's home. The Defendants respond that the agents actions violated the scope of a permissible knock and talk and that there were no exigent circumstances to justify the agents' entry into Defendant Whitaker's home. The Defendants further respond that the independent source doctrine does not apply to this case because the evidence was not "subsequently discovered."[1]

### I. Standard of Review

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are

---

[1]Defendant Coffey also raises arguments regarding the search of his car during the search of Defendant Whitaker's home. This issue was ancillary to the main issue addressed at the suppression hearing and only briefly touched upon by the trial court following its ruling on the primary issue. As such, we believe that it would be better for the trial court to examine Defendant Coffey's arguments on remand, rather than for this court to address them here.

binding on appeal unless the evidence in the record preponderates against them." Id. A trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Meeks, 262 S.W.3d at 722.

Both the federal and state constitutions offer protection from unreasonable searches and seizures with the general rule being "that a warrantless search or seizure is presumed unreasonable and any evidence discovered subject to suppression." Talley, 307 S.W.3d at 729 (citing U.S. Const. amend. IV; Tenn. Const. art. I, § 7). As has often been repeated, "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment–subject to only a few specifically established and well delineated exceptions.'" Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971) (quoting Katz v. United States, 389 U.S. 347, 357 (1967)); see also State v. Berrios, 235 S.W.3d 99, 104 (Tenn. 2007). These constitutional protections "are designed to safeguard the privacy and security of individuals against arbitrary invasions of government officials." Id. (quoting State v. Keith, 978 S.W.2d 861, 865 (Tenn. 1998)) (internal quotation marks omitted).

*II. Knock and Talk*

This court has previously recognized the validity of the knock and talk procedure. State v. Cothran, 115 S.W.3d 513, 522 (Tenn. Crim. App. 2003). The procedure is considered to be a consensual encounter with the police and a means for police officers "to request consent to search a residence." Id. at 521. In explaining the knock and talk procedure and the reasoning for it, this court has quoted with approval the following:

> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, at high noon, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof-whether the questioner be a pollster, a salesman, or an officer of the law.

Id. (quoting United States v. Cormier, 220 F.3d 1103, 1109 (9th Cir. 2000)).

Put another way, any "sidewalk, pathway or similar passageway leading from a public sidewalk or roadway to the front door of a dwelling represents an implied invitation to the general public to use the walkway for the purpose of pursuing legitimate social or business interest with those who reside within the residence." State v. Harris, 919 S.W.2d 619, 623 (Tenn. Crim. App. 1995). Accordingly, it "cannot be said a person has an expectation of

privacy in the area in the front of his residence which leads from the public way to the front door." Id. (quoting State v. Baker, 625 S.W.2d 724, 727 (Tenn. Crim. App. 1981)). Whatever an officer sees in this area "is not protected by either the Fourth Amendment or the state constitution." Id. at 624. However, "[a]ny substantial and unreasonable departure from an area where the public is impliedly invited exceeds the scope of the implied invitation and intrudes upon a constitutionally protected expectation of privacy." Id. (quoting State v. Seagull, 632 P.2d 44, 47 (Wash. 1981)) (internal quotation marks and brackets omitted).

The trial court concluded that the agents exceeded the scope of the knock and talk by going "to areas of the curtilage that they weren't supposed to," chiefly, that two agents went to the home's other entrance that appeared to be "non-accessible." However, Defendant Whitaker had no reasonable expectation of privacy in this area, and it was not a part of the curtilage of the home. See Talley, 307 S.W.3d at 729 (citing Oliver v. United States, 466 U.S. 170, 180 (1984)) (defining "curtilage" as "any area adjacent to a residence in which an individual can reasonably expect privacy"). The area where the second door was located was facing the road and readily viewable from the driveway. Cf. State v. Rebecca Draper and J.C. Draper, No. E2011-01047-CCA-R3-CD, 2012 WL 1895869, at *4-5 (Tenn. Crim. App. May 24, 2012) (concluding that area behind a trailer home that was not viewable from the street or driveway and was obscured by trees and heavy brush was a part of the curtilage of the home). Therefore, the agents did not exceed the scope of the knock and talk by going to that area of the home.

Nor did the agents intrude on the curtilage of the home by going to the porch on the "back" side of the trailer home. Agent Davis testified that the driveway led to that area of the home, that there were cars parked in front of the porch, and that the porch appeared to be the "main" and only functional entrance to the home. The agents followed the driveway to the area that served as the main entrance to Defendant Whitaker's home. The fact that the entrance did not face the road or that there was not a cobblestone pathway or a set of ornate stepping stones leading from the end of the driveway to the porch does not mean that the agents had encroached upon the curtilage of the home. Instead, the operative question is whether there was an implied invitation for any citizen to approach the porch. Given that the driveway led to that area of the home, that there were cars parked in front of the porch, and that the porch appeared to be the only functional entrance to the home, we conclude that such an invitation existed and permitted the agents to walk up to the porch and knock on the sliding glass door.

On appeal, the Defendants argue that because the agents approached Defendant Whitaker's home at night, their actions constituted a seizure and not a permissible knock and talk. To determine whether the agents' actions constituted a seizure of the Defendants we inquire as to "whether a reasonable person would feel free to decline the [agents'] requests

or otherwise terminate the encounter." <u>Florida v. Bostick</u>, 501 U.S. 429, 436 (1991). The fact that the encounter occurred at night does not per se invalidate a knock and talk, but it is instead a factor to be considered in conjunction with the other circumstances surrounding the encounter. <u>See</u> <u>Scott v. State</u>, 782 A.2d 862, 869 (Md. 2001) (stating that no court has found a seizure "based solely" on the fact that a knock and talk occurred at night). Here, the agents arrived at Defendant Whitaker's residence at approximately 10:00 p.m.

While the encounter occurred at night, it was not particularly late at night and the lights in the home were on, evidencing that the agents did not rouse Defendant Whitaker from his sleep. Agent Davis testified that they attempted the knock and talk at that time because he had received a tip late in the afternoon that marijuana would be harvested at the home that night. There was also no evidence that the agents' weapons were visible or that the Defendants were aware that two agents had approached the home's second entrance. When Defendant Whitaker answered the door he was faced with two agents in plain clothes and one Sheriff's deputy in uniform. When asked for his consent to allow the agents to search the trailer home, Defendant Whitaker told Agent Davis he could search his home after he got a warrant. Based upon the foregoing, we conclude that the agents' actions constituted a permissible knock and talk and did not amount to a unlawful seizure of the Defendants.

### III. Exigent Circumstances

"Even though a felony has been committed and officers have probable cause to believe that they will locate incriminating evidence inside a residence, a warrantless entry to search for contraband or weapons is unconstitutional absent exigent circumstances." <u>State v. Carter</u>, 160 S.W.3d 526, 531 (Tenn. 2005) (citing <u>Payton v. New York</u>, 445 U.S. 573, 587-88 (1980)). Exigent circumstances "are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." <u>Meeks</u>, 262 S.W.3d at 723.

Put another way, exigent circumstances arise when "the needs of law enforcement are so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." <u>Meeks</u>, 262 S.W.3d at 723 (quoting <u>Brigham City, Utah v. Stuart</u>, 547 U.S. 398, 403 (2006)) (internal quotation marks and brackets omitted). Exigent circumstances exist only when "the State has shown that the search was imperative." <u>Id.</u> Exigent circumstances frequently arise in the following situations: "(1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." <u>Id.</u>

In determining the constitutionality of a warrantless search, "the inquiry is whether the circumstances give rise to an objectively reasonable belief that there was a compelling need to act and insufficient time to obtain a warrant." Meeks, 262 S.W.3d at 723. "The exigency of the circumstances is evaluated based upon the totality of the circumstances known to the governmental actor at the time of the entry." Id. (emphasis added). The State "must rely upon specific and articulable facts and the reasonable inferences drawn from them" rather than on mere speculation. Id. at 723-24.

Police-created exigent circumstances cannot be used to justify a warrantless entry into a constitutionally protected area. Carter, 160 S.W.3d at 532. Additionally, the "manner and the scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone." Meeks, 262 S.W.3d at 724. When the asserted exigency is risk to the safety of the officers or others, "the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm." Id.

We agree with the trial court's conclusion that Agent Davis's removal of Defendant Whitaker from the house and the subsequent search of the house by Agents McCallie and Arrington were not justified by exigent circumstances. Agent Davis admitted at the suppression hearing that when these actions occurred, "[t]here was no immediate threat to anyone at that time," and there was nothing to suggest that the evidence was in danger of being destroyed by the occupants of the house. The only evidence to support the State's argument that the agents' actions were justified was speculation by Agent Davis that there is always a possibility of evidence being destroyed or a threat of serious harm in narcotics investigations. Here, there were no specific and articulable facts to justify the agents' actions; therefore, we conclude that their actions amounted to an unlawful warrantless search of Defendant Whitaker's home.

*IV. Independent Source Doctrine*

The exclusionary rule bars "the admissibility of evidence either directly or indirectly obtained from an unconstitutional search or seizure," but it does not apply "to evidence obtained by means independent of the constitutional violation." Carter, 160 S.W.3d at 532 (citing Wong Sun v. United States, 371 U.S. 471, 485, 487 (1963)). The independent source doctrine does not apply, as the Defendants argue, "only to evidence obtained for the first time during an independent lawful search" but instead, applies "to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." Murray v. United States, 487 U.S. 533, 537 (1988).

-8-

To that end, the ultimate question to determine if the independent source doctrine applies is "whether the search pursuant to warrant was in fact a genuinely independent source" of the evidence. Murray, 487 U.S. at 542. This would not be the case "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the [issuing judge] and affected his decision to issue the warrant." Id. (internal footnote omitted). Put another way, an unlawful entry does not mandate the suppression of evidence if the evidence is subsequently obtained "following the execution of a valid warrant based upon facts independent and separate from information discovered as a result of the unlawful entry." Carter, 160 S.W.3d at 532 (emphasis added).

The trial court erred in its determination that the independent source doctrine did not apply to this case because the evidence at issue was not "subsequently discovered" during the execution of the search warrant. Instead, the determinative question is whether the decision to obtain the search warrant and the issuance of the search warrant were tainted by what Agents McCallie and Arrington discovered during their unlawful search of the home. Agent Davis testified that he left to obtain the search warrant before Agents McCallie and Arrington entered the home and that he decided to obtain the search warrant based upon the "overwhelming" smell of "fresh" marijuana coming from the home.

Agent Davis's affidavit made no mention of what Agents McCallie and Arrington discovered and was based upon the information obtained during the valid knock and talk as well as the anonymous tip and information from the utility company. There is no evidence that the issuing judge was aware of what Agents McCallie and Arrington had discovered or that Agent Davis concealed this information from the issuing judge. Accordingly, we conclude that the search warrant was not tainted by the unlawful search of Defendant Whitaker's home and constituted an independent source for the evidence.

## CONCLUSION

In consideration of the foregoing and the record as a whole, we conclude that the trial court erred in granting the Defendants' suppression motions and dismissing the indictments. Therefore, we reverse the judgments of the trial court and remand the cases for further proceedings consistent with this opinion.

_____
D. KELLY THOMAS, JR., JUDGE